## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. MORGAN O'BRIANT, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 26-cv-00028-SH |
| | ) | |
| v. | ) | |
| | ) | |
| 2. JIM GLOVER CDJR, LLC, an | ) | **VERIFIED COMPLAINT** |
| Oklahoma limited liability company, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) | |
| | ) | |

Plaintiff, Morgan O'Briant, by and through her counsel, David M. Menditto of Menditto Law PLLC, for her claims for relief against Defendant, Jim Glover CDJR, LLC ("Jim Glover," the "Dealership," or "Defendant"), states as follows:

## I.
## NATURE OF CASE

1.    This action arises out of Ms. O'Briant's purchase of a 2023 Dodge Durango (the "Durango" or "Vehicle") from Jim Glover.  From the onset, and unbeknownst to Ms. O'Briant, Jim Glover's employees engaged in a pattern of deception and concealment designed to induce Ms. O'Brian to complete the Vehicle purchase.

2.    For weeks, Jim Glover's employees strung Ms. O'Briant along, rotating through various excuses for why the initial repairs to the Durango were not finished, falsely stating that Jim Glover had obtained the title, and falsely assuring her that third-party financing had been secured and the paperwork was already "in the mail."  Throughout that time, Ms. O'Briant consistently advised Jim Glover that her payment to the third-party lender was approaching and, later, that it had become delinquent.  Nevertheless, Jim Glover continued to stonewall Ms. O'Briant as to why she had not received the financing paperwork.  Eventually, Jim Glover

1

conceded that it had not, in fact, secured the promised financing and demanded that Ms. O'Briant either (a) return the Vehicle and receive her initial deposit, (b) sign new paperwork for her purchase, or (c) secure her own financing.

3.    On numerous occasions, Ms. O'Briant, through counsel, informed Jim Glover and its attorney that she wanted to keep the Durango and was willing to make her payments to Jim Glover, as expressly permitted under Jim Glover's purchase documents.  Jim Glover refused to accept any such payments and, instead, insisted that Ms. O'Briant agree to its demands.  Then, while Ms. O'Briant's attorney believed he was still engaged in good faith discussions with Jim Glover's attorney, the Dealership dispatched agents to repossess the Durango.

4.    The facts described below overwhelmingly support Ms. O'Briant's claims, justifying a Judgment in his favor and against Defendants for injunctive relief, actual damages, civil penalties, punitive damages, twice the amount of her finance charges, and attorney fees and costs.

## II.
## PARTIES

5.    At all relevant times, Ms. O'Briant has been a resident of Coal County, Oklahoma.

6.    At all relevant times, Jim Glover has been an Oklahoma limited liability company with its principal place of business in Tulsa County, Oklahoma.

## III.
## JURISDICTION AND VENUE

7.    Pursuant to 28 U.S.C. §1331, this Court has federal question jurisdiction over this matter as it arises, in part, under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, and Regulation Z, 12 C.F.R. 226, *et seq.*

8.      Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Ms. O'Briant's claims arising under Oklahoma state law because they are so related to Ms. O'Briant's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

9.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because Jim Glover resides in this judicial district and a substantial part of the events giving rise to Ms. O'Briant's claims occurred in this judicial district.

**IV.**
**STATEMENT OF FACTS**

**A.      Ms. O'Briant's Initial Dealings with Jim Glover**

10.     On or around August 19, 2025, Ms. O'Briant saw the Durango advertised for sale by Jim Glover on Facebook Marketplace.  Ms. O'Briant submitted a request for information about the Durango.

11.     A Jim Glover representative ("Hector") responded to Ms. O'Briant's inquiry.

12.     Hector and Ms. O'Briant exchanged numerous Facebook messages that day. Copies of those Facebook messages are combined in the attached **Exhibit A**.  Those messages included the following:

        a.  Hector sent Ms. O'Briant a video of the Durango and informed her of a small dent on one of the doors.  Hector provided a picture of the dent and stated "This is the only damage I see, just want to be fully transparent."  Hector stated that the "dent is getting fixed."  Hector's representation that the dent was the only visible damage later turned out to be untrue.

    b.  Ms. O'Briant completed an online credit application.  Hector indicated that he would review the application and then provided Ms. O'Briant  with the following proposal:

      i.  Vehicle Price: $31,554.00

      ii.  Cash Downpayment: $1,500.00;

      iii.  Additional Fees: $499.00; and

      iv.  Total Amount Financed: $30,533.00.

    c.  Ms. O'Briant advised Hector that she wanted to discuss the deal with her husband.  Hector informed Ms. O'Briant that his manager had sent her a link to "reserve" the Durango by paying a $500.00 deposit.

    d.  Mr. O'Briant indicated that she wanted to pay the $500.00 deposit to reserve the Durango.  At that point, Hector informed Ms. O'Briant *for the first time* that a part needed to be installed on the Vehicle.  Ms. O'Briant inquired as to the part required, and Hector revealed that "a brake module … needs replacing."

*See* Ex. A.

13.    Notwithstanding her surprise that Hector had failed to disclose the brake module issue when he claimed to disclose the "only damage" to the Durango, Ms. O'Briant paid the $500.00 deposit to reserve the Vehicle.

14.    Ms. O'Briant did not hear from Hector or anyone else at Jim Glover for the next six (6) days.

15.    Finally, on August 25, 2025, Ms. O'Briant began sending messages to Hector to find out the status of the brake module replacement.  *See* Ex. A.

16.    Hector repeatedly assured Ms. O'Briant that the service department was working to complete the repair work.  Below are some of Hector's responses to Ms. O'Briant's inquiries:

    a.    **Aug. 25:**  Hey Morgan! Service made really good progress today.  Tomorrow they will run a couple more tests before telling me for sure that everything is good.  From there we just detail it and touch up the dents!

    b.    **Aug. 26:**  Service still has the Durango.  The advisor told me he will have an update by end of day today.

    c.    **Aug. 27:**  Its still in the shop today.  There's a couple codes on it that we need to address.  Our goal is to have it ready for you before the end of the month.

    d.    **Aug. 28:**  I will get with Blake, my General Sales Manager and see what we can do to speed up service.

*See* Ex. A.

17.    On August 29, 2025, Ms. O'Briant informed Hector that she could no longer wait for the Durango to be repaired and requested that Jim Glover provide her a loaner vehicle.  *See* Ex. A.  Jim Glover agreed to this request.

**B.    Ms. O'Briant's Purchase of the Durango**

18.    On Saturday, August 30, 2025, Ms. O'Briant visited the Jim Glover dealership to inspect the Durango and determine whether to proceed with the purchase.

19.    Upon inspection, Ms. O'Briant discovered a large scratch on the rear bumper and a broken taillight.

20.    Ms. O'Briant questioned why this damage had not been disclosed to her by Hector, as they were clearly visible to anyone who inspected the Vehicle.

21.    Jim Glover acknowledged the additional damage and assured Ms. O'Briant that it would be fixed along with the brake module replacement.

22.     Notwithstanding the undisclosed additional damage to the Durango, Ms. O'Briant decided to proceed with purchasing the Vehicle.

23.     Ms. O'Briant met with Jim Glover's Finance Manager, Kentra Lawrence ("Lawrence") to electronically sign documents related to her purchase.

24.     At 10:44 a.m., Jim Glover sent Ms. O'Briant the following email:

Dear Morgan

Please find your attached Deal_50280_Documents.pdf

This document is password protected. You must enter the below information to access the document:

The first three letters of your first name (As provided at the dealership. Avoid spaces and periods, if any) in UPPER CASE and the last four digits of your SSN. Example - If your name is John Smith and SSN is XXX-XX-0000, then your password is JOH0000

A copy of the email, with the documents contained in the password-protected .pdf file are attached as **Exhibit B**.

25.     The .pdf file contained the following documents (collectively referred to as the "Purchase Packet")":

    a.  Credit Application (5 pages) (unsigned);

    b.  GAP Addendum (5-page document, although there are 4 copies of page 1) - Electronically signed by Ms. O'Briant and initialed by Lawrence;

    c.  Ultra+ Vehicle Service Contract (15 pages) - Electronically signed by Ms. O'Briant and initialed by Lawrence;

    d.  Buyers Guide (2 pages) - Electronically signed by Ms. O'Briant;

    e.  Retail Installment Sale Contract - Simple Finance Charge (With Arbitration Provision) (the "Finance Sale Agreement") (4 pages) - Electronically signed by Ms. O'Briant and initialed by Lawrence;

    f.  Customer Acknowledgements (1 page) - Electronically signed by Ms. O'Briant;

g.  Dispute Resolution Clause (1 page) - Electronically signed by Ms. O'Briant and initialed by Lawrence

h.  Down Payment Disclosure (1 page) - Electronically signed by Ms. O'Briant and initialed by Lawrence;

i.  Title Paperwork Handling Selection (1 page) - Electronically signed by Ms. O'Briant; and

j.  Motor Vehicle Services Odometer Disclosure Statement (1 page) - Electronically signed by Ms. O'Briant and initialed by Lawrenc.

*See* Ex. B.

26.    The above-listed documents were the ***only*** documents provided to Ms. O'Briant after she electronically signed the paperwork at the Dealership.

27.    Importantly, Jim Glover's Finance Sale Agreement was between Ms. O'Briant (identified as "Buyer" and "You") and Jim Glover (identified as "Seller-Creditor," "We," or "Us"). *See* Ex. B.

28.    All rights and obligations of the parties in the Finance Sale Agreement were between Buyer (*i.e.*, Ms. O'Briant) and Seller-Creditor (*i.e.*, Jim Glover).   The following provisions, among others, support this position:

a.  "You [*i.e.*, Ms. O'Briant] agree to pay the Seller - Creditor … the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below."

b.  "**How we [*i.e.*, Jim Glover] will figure Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed."

c.  "**How we [*i.e.*, Jim Glover] will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose as the law allows.

*See* Ex. B.

29.     The unambiguous language in Jim Glover's Finance Sale Agreement established that the Dealership was responsible for calculating the finance charge and handling payments from Ms. O'Briant.

30.     The Finance Sale Agreement included a provision stating that "Seller assigns its interest in this contract to ARVEST BANK (Assignee) under the terms of Seller's agreement(s) with Assignee." *See* Ex. B.

31.     Notwithstanding Jim Glover's purported assignment of its Finance Sale Agreement to Arvest Bank (which, in fact, never occurred), Jim Glover remained bound by its obligations under the Finance Sale Agreement.

**C.     Ms. O'Briant's Post-Purchase Communications with Jim Glover Regarding Her Financing and the Repairs to Her Durango**

32.     Soon after leaving the Dealership with a loaner vehicle, Ms. O'Briant sent the following text message to Lawrence: "Quick question!  Where do I make my payments?  Is there an app?"  Copies of Ms. O'Briant's text messages with Lawrence are combined in the attached **Exhibit C**.

33.     Lawrence responded that she had left for the day and would let Ms. O'Briant know on Monday how payments would be made.  *See* Ex. C.  She did not.

34.     On September 2, 2025, Ms. O'Briant texted Lawrence to ask if she could remove the service warranty charge.  *See* Ex. C.  Lawrence responded, "I'm sorry everything is already sent to the lender."  *See* Ex. C.

35.     Lawrence then texted Ms. O'Briant:

Your lender is Arvest bank!  They will mail you a packet with all the information and different ways to pay[.]

*See* Ex. C.

8

36.     The clear implication of Lawrence's message was that Arvest Bank had already accepted the assignment of the Finance Sale Agreement and agreed to fund Ms. O'Briant's purchase.  This later turned out to be untrue.

37.     Lawrence knew at the time she made these representations that she was deceiving Ms. O'Briant as to the status of her financing.

38.     Meanwhile, Ms. O'Briant continued to exchange messages with Hector regarding the status of the repair work on her Durango.  *See* Ex. A.

39.     Hector repeatedly assured Ms. O'Briant that the Vehicle would be ready soon, but he always had an excuse as to why the work was being delayed.  *See* Ex. A.

40.     On September 15, 2025, Ms. O'Briant sent the following message to Hector:

So how long do I have to wait for "a matter of having it installed" it's been 17 days since I purchased the car. And 4 days away from being a month then I put 500 down to have it secured and invested interest on it. I'm not sure how this is just not a priority for the dealership at this point. You told me Friday that we were looking at Monday and for me to pick the car up but it hasn't been detailed. Nor worked on. I just seriously think I'm getting the run around and I'm not happy at all at this point. Here in a month my first payment is due and I have not even drove the car once. The only thing I have been offered was a loaner.  At this point I should had just not purchased the car.

*See* Ex. A.

41.     Although Ms. O'Briant raised a concern about her impending first payment and expressed regret over having purchased the Durango, no one at Jim Glover informed her that Arvest Bank still had not agreed to fund her purchase.

42.     Finally, on September 17, 2025, Hector informed Ms. O'Briant that her Durango was ready to be picked up.

43.     In truth, Jim Glover had not performed all of the necessary repair work.  The taillight still had not been replaced.

44.     Rather than wait additional days, Ms. O'Briant picked up her Durango with the expectation that the taillight would arrive at some point.  Jim Glover later agreed to mail the taillight to Ms. O'Briant's home so her husband could install it.

45.     The following day, Ms. O'Briant sent a text message to Lawrence informing her that the Durango had not been detailed as promised, had tar on it, smelled like a dog, and had tampon trash in it.  Jim Glover agreed to reimburse Ms. O'Briant to have the Vehicle detailed.

**D.     Jim Glover's Ongoing Deception Regarding the Financing of Ms. O'Briant's Purchase of the Durango**

46.     On Monday, September 22, 2025, Ms. O'Briant and Lawrence had the following text exchange:

Ms. O'Briant: Sorry to bother you, I still haven't got my finance info from the bank is that normal? Will it just be sent closer to my payment date

Lawrence: Yes, that's normal.  Sometimes you may not get it till the week before your first payment is due

*See* Ex. C.

47.     Once again, Lawrence had misled Ms. O'Briant into believing that the financing through Arvest Bank was proceeding "normally" and that she simply had to wait for payment information from the bank.

48.     As of September 29, 2025 (*30 days after Ms. O'Briant purchased the Durango*), Jim Glover still had not provided Ms. O'Briant with the title to the Vehicle.

49.     Still, no one at the Dealership advised Ms. O'Briant that Arvest Bank had not agreed to fund the purchase.

50.     October 14, 2025 was the date on which Ms. O'Briant's payments under the Finance Sale Agreement were scheduled to begin.  As of October 13, 2025, however, she still had not received any information from Arvest Bank regarding how she should make her payments.

51.     Ms. O'Briant exchanged messages with Hector in which she stated, "tomorrow my car payment is due and I have no bank papers or anything yet.  What do I do"  *See* Ex. A.

52.     Hector replied, "It should be in your mail."  This was yet another misrepresentation by Jim Glover regarding Arvest Bank's financing of Ms. O'Briant's purchase.

53.     On November 3, 2024, Ms. O'Briant took it upon herself to call Arvest Bank to request information regarding how she should make her payments for the financing of her Vehicle.

54.     Ms. O'Briant was *shocked* to learn that Arvest Bank did not have *any* accounts in Ms. O'Briant's name.

55.     Fifteen (15) days later, on November 18, 2025, the temporary tag that Jim Glover had provided for the Durango expired.

56.     That same day, November 18, 2025, Arvest Bank obtained a TransUnion credit report for Ms. O'Briant.  No one at Jim Glover informed Ms. O'Briant that Arvest was going to do this.  Instead, Ms. O'Briant learned of it weeks later when she received correspondence from Arvest Bank informing her of the credit check.  A copy of the correspondence from Arvest Bank is attached as **Exhibit D**.

57.     On Saturday, November 29, 2025, at 9:53 a.m., Ms. O'Brian received the below text message from Jim Glover:

> Dear Morgan, Please click on the link below to learn more about the 2023 dodge Durango.  Https://.arctkon.io/00117d28e7636
>
> - Jim Glover Chrysler Dodge Jeep RAM Fiat

A copy of this text message, along with three (3) identical text messages sent around the same time, are attached as **Exhibit E**.

58.     The link Jim Glover provided was not for the purpose of Ms. O'Briant "learn[ing] more about the 2023 dodge Durango."   Instead, it was a link for Ms. O'Briant to open and electronically sign *new* paperwork related to her purchase of her Vehicle.

59.     Ms. O'Briant had no idea why Jim Glover was sending her a link for the new paperwork.

60.     Over two and one-half (2-1/2) hours later, at 12:32 p.m., Lawrence left the following voicemail message for Ms. O'Briant:

> Hey, Morgan, this is Kentra [Lawrence] with Jim Glover Finance. Um … we, um … finally got the title in to your Durango, um … so just wanted to … uh … let you know that we needed to resign some paperwork so we could get it issued to you … um, just with the dates … um, within the lien dates, so if you could just give me a call, my cell phone is (918) 978-7293.  Talk to you soon.  Thanks. Bye.

61.     This was yet *another misrepresentation* related to Ms. O'Briant's financing of her Durango.  As demonstrated below, Jim Glover had actually obtained the title to the Durango in October.

62.     Following Lawrence's voicemail, Jim Glover began sending more texts with the same link to the new paperwork, each time representing that the purpose of the link was to "learn more about the 2023 dodge Durango."   The texts were sent at 3:55 p.m. and 6:35 p.m., and the next day (Sunday, November 30, 2025) at 11:58 a.m.

63.     On December 1, 2025, at noon, Ms. O'Briant texted Lawrence, "My temporary tag is out."  *See* Ex. C.

64.     Lawrence replied, "I just sent you the new documents that we need signed because we just received your title and I have to have everything within the lien date once you sign those I can get you a new temporary tag."  *See* Ex. C.  Once again, Lawrence misrepresented that Jim Glover had "just received" the title to the Durango.

65.    Ms. O'Briant, exasperated by this point, stated that she would sign new paperwork, subject to certain conditions.  She and Lawrence had the following text exchange:

Ms. O'Briant: I will resign.  But I want the gap and service warranty dropped and the adp fee of 489 dropped please.  And we will not be rerunning my credit.

Lawrence: I just spoke to our GM.  We cannot wave the doc fee as this is state requirement for all deals across the dealership to have the same document fee and I we have to rerun credit to get new approval.  If this is an issue please just bring the [vehicle] back.

Ms. O'Briant: This is your mistake not mine!  My credit will not be taking a hit due to your mistake.  why are you having to rerun my credit?  What happened to the first application and why didn't I receive the paperwork within the first 30 days as required?  The dealership is required to keep the car legal to drive.  While we sort this out.  so the temporary tag needs to be mailed.

*See* Ex. C.

66.    Ms. O'Briant did not realize at the time that Arvest Bank had already rerun her credit, again without her knowledge or consent.

67.    Lawrence did not disclose to Ms. O'Briant that Jim Glover had already requested that Arvest Bank rerun her credit.  Instead, Lawrence stated that Ms. O'Briant had to fully comply with her demands or return the Vehicle.  No compromise was offered.

68.    Soon thereafter, Jim Glover texted another link to the new paperwork to Ms. O'Briant.

69.    At this point, Adam Clinkenbeard ("Clinkenbeard"), the General Manager, took the lead in communicating with Ms. O'Briant.

70.    At 3:28 p.m., Ms. O'Briant sent the following email to Clinkenbeard:

Hi, Adam

I'm ready to re-sign the contract today, but the following adjustments need to be reflected:

1.  Please remove the **ADP protection plan ($489)**. "Doc fee"

2.   Please remove **GAP ($1,250)**.
3.   Please remove the **service warranty ($4,037)**.
4.   The vehicle now has **39,775 miles** (4,355 more than at purchase) and will be **one model year older in 30 days**, reducing its market value by **$2,127**.
5.   I request the dealership cover **the tag and registration fees in full**.

After these corrections, I am willing to finance a total of **$27,537**. If we can update the contract to this amount, I'm ready to sign today.

Thank you,
Morgan O' Briant

A copy of Ms. O'Briant's December 2, 2025, 3:28 p.m., email to Clinkenbeard is attached as **Exhibit F** (emphasis supplied in original).

71.     Following that email, at 4:42 p.m., Ms. O'Briant began what would be a 45-minute telephone conversation with Clinkenbeard during which she expressed frustration over how she had been treated by Jim Glover.

72.     Clinkenbeard told Ms. O'Briant that he would not issue a new temporary tag unless she signed new paperwork for her purchase of the Durango.

73.     At 4:53 p.m. (11 minutes into the conversation), Clinkenbeard sent an email to Ms. O'Briant, with no message and attaching a .pdf file of a Motor Vehicle Delivery Agreement (the "Spot-Delivery Agreement"). A copy of Clinkenbeard's December 2, 2025, 4:53 p.m., email to Ms. O'Briant, with the Spot-Delivery Agreement, is attached as **Exhibit G**.

74.     *This was the first time that Jim Glover provided Ms. O'Briant with a copy of the Spot-Delivery Agreement.* It was not included in the Purchase Packet sent to her on August 30, 2025. *See* Ex. B.

75.     At 5:10 p.m. (28 minutes into the conversation), Clinkenbeard sent another email to Ms. O'Briant, again without a message, attaching a .pdf file of a Purchase Agreement. A copy of Clinkenbeard's December 2, 2025, 5:10 p.m., email to Ms. O'Briant, with the Purchase

Agreement, is attached as **Exhibit H**. This document also was not included in the Purchase Packet. *See* Ex. B.

76.     Clinkenbeard was defensive and dismissive during his call with Ms. O'Briant. However, he eventually offered a resolution, which Ms. O'Briant indicated she wanted to discuss with her husband.

77.     Following this telephone conversation, Clinkenbeard sent Ms. O'Briant an email in which he summarized his proposal. A copy of Clinkenbeard's email exchange with Ms. O'Briant is attached as **Exhibit I**.

78.     Clinkenbeard's proposal was that Jim Glover would deduct $160.00 from the ADP Fee. *See* Ex. J. This squarely contradicted Lawrence's claim that state law *required* Ms. O'Briant to pay the entire fee.

79.     Clinkenbeard also offered to deduct $700 from the sale price of the Vehicle. *See* Ex. J.

80.     Ms. O'Briant never responded to Clinkenbeard's email, nor did she ever agree to the proposal.

81.     On or around December 3, 2025, Ms. O'Briant submitted a complaint to the Oklahoma Used Motor Vehicle, Dismantler & Manufactured Housing Commission (the "OUMV Commission") in which she outlined the issues she had been having with Jim Glover.

82.     The next day, December 4, 2025, the OUMV Commission sent an email to Ms. O'Briant in which it stated:

Good afternoon,

We have received your complaint against JIM GLOVER CDJR and are working towards obtaining your title for you.

Keep this email along with a copy of the purchase agreement to show law enforcement that you have taken steps to correct a situation that is out of your control. Do not draw attention to yourself and obey all traffic laws.

A copy of the OUMV Commission's email to Ms. O'Briant is attached as **Exhibit J**.

83.     On or around December 9, 2025, Jim Glover responded to Ms. O'Briant's complaint to the OUMV Commission through its Comptroller, Mandi Knight ("Knight").  A copy of Jim Glover's response to the complaint is attached as **Exhibit K**.

84.     In Jim Glover's response, Knight admitted that it was not until the "end of October" that "All title documentation [for the Durango] was finally secured." *See* Ex. K.  This contradicted Lawrence's representations to Ms. O'Briant at the end of November that Jim Glover had "just received" the title to the Vehicle.

85.     In addition, Knight misrepresented to the OUMV Commission that "Ms. O'Briant ha[d] not completed the purchase agreement." *See* Ex. K.

86.     Knight knew that Ms. O'Briant had, in fact, signed the Finance Sale Agreement and other documents with Jim Glover.  If she had not, Jim Glover never would have given Ms. O'Briant possession of the Durango and would not have deceived her *for months* into believing that financing had been secured through Arvest Bank.

87.     Knight also falsely claimed to the OUMV Commission that Jim Glover's attorney had "attempted to reach an amicable resolution with Ms. O'Briant's counsel but received no response." *See* Ex. K.  In truth, Ms. O'Briant's attorney had promptly responded to Jim Glover's attorney, acknowledging the attorney's email and stating that he would provide a substantive response the following week.

88.    Knight's misrepresentations regarding Ms. O'Briant and her attorney were made knowingly and with the intent of portraying Ms. O'Briant as being unreasonable in her efforts to resolve her dispute with Jim Glover through the OUMV Commission.

89.    Knight ended Jim Glover's response to the OUMV Commission by claiming, ""Due to the outstanding payment, we [*i.e.*, Jim Glover] are currently unable to provide [Ms. O'Briant] with the title." *See* Ex. K.  This was patently false.

90.    Jim Glover *could* (and still *can*) provide Ms. O'Briant with the title to her Durango, but the Dealership is unwilling to do so unless Ms. O'Briant signs new paperwork, which carries the risk that financing will not be approved and Jim Glover will once again attempt to rescind the deal.

91.    Ms. O'Briant, through counsel, has repeatedly advised Jim Glover that Ms. O'Briant stands ready and willing to make her payments to Jim Glover *as provided in her Finance Sale Agreement*.

92.    Ms. O'Briant has since deposited $2,538.44 into the undersigned counsel's client trust account for the benefit of Jim Glover to be released to the Dealership whenever it agrees to accept the payments.

93.    The amount being held in trust for Jim Glover represents four (4) monthly payments that Ms. O'Briant would have paid under her Finance Sale Agreement if Jim Glover had been willing to accept payment or, alternatively, if Jim Glover had secured the financing with Arvest Bank that it had falsely claimed to have secured.

94.    Notwithstanding the good faith efforts of Ms. O'Briant and her counsel to negotiate an amicable resolution of her dispute with Jim Glover, on December 8, 2025, *at approximately 9:20 p.m.*, Jim Glover dispatched two (2) agents to Ms. O'Briant's home to repossess the Durango.

95.     Ms. O'Briant lives in a rural community on ten (10) acres of land, with a quarter (1/4)-mile driveway that the repossession agents had to drive up to reach Ms. O'Briant's residence where the Durango was parked.

96.     Understandably, Ms. O'Briant, her husband, and their three (3)-year old daughter were alarmed to find two individuals on their property in the dark of night.

97.     They were even more alarmed when the two individuals refused to leave Ms. O'Briant's property when she and her sister (who was present at the time) told them that they were trespassing and demanded that they leave.

98.     The experience was incredibly intimidating and stressful for the entire family.

99.     Ms. O'Briant remains fearful that Jim Glover will again try to repossess the Durango while it is on her property or while she is driving the Vehicle in public, even though she has been authorized to do so by the OUMV Commission.

**V.**
**CAUSES OF ACTION**

**COUNT I – BREACH OF CONTRACT**

100.    Ms. O'Briant incorporates Paragraphs 10 through 99 above as if fully set forth in this Count I.

101.    Ms. O'Briant lawfully entered into the Finance Sale Agreement with Jim Glover.

102.    The Finance Sale Agreement was supported by consideration.

103.    Under Oklahoma law, the Finance Sale Agreement included an implied duty of good faith and fair dealing, which Ms. O'Briant and Jim Glover owed to one another. *See Wathor v. Mut. Assur. Adm'rs, Inc.*, 2004 OK 2, ¶ 5, 87 P.3d 559, 561, *as corrected* (Jan. 22, 2004).

104.    The Finance Sale Agreement, by its express terms, is between Ms. O'Briant (identified as "Buyer" and "You") and Jim Glover (identified as "Seller-Creditor," "We," or "Us"). *See* Ex. B.

105.    The Finance Sale Agreement, by its express terms, provides that "Federal law and the law of the state of Oklahoma apply to this contract."

106.    Under Oklahoma law, as incorporated into the Finance Sale Agreement, Jim Glover was obligated to provide Ms. O'Briant with title to the Durango no later than thirty (30) days after her purchase of the Vehicle.  *See* 47 O.S. § 1101.

107.    Although Jim Glover purported to assign its "interest" in the Finance Sale Agreement to Arvest Bank, such an assignment did not absolve Jim Glover of its obligations under the Finance Sale Agreement.  *See* 12A O.S. § 2-210(1) ("A party may perform his duty through a delegate unless otherwise agreed or unless the other party has a substantial interest in having his original promisor perform or control the acts required by the contract. *No delegation of performance relieves the party delegating of any duty to perform or any liability for breach*.") (emphasis added).

108.    Jim Glover fully understood that the Dealership remained bound by the Finance Sale Agreement, as demonstrated by its performance of other obligations under the Finance Sale Agreement.

109.    Jim Glover breached its express obligations and its duty of good faith and fair dealing under the Finance Sale Agreement by, among other things:

   a.   failing to provide Ms. O'Briant with title to the Durango within thirty (30) days;

   b.   refusing to accept Ms. O'Briant's tender of payments pursuant to the Finance Sale Agreement;

    c.   misrepresenting to Ms. O'Briant that the financing of her purchase through Arvest Banik had been secured;

    d.   misrepresenting to Ms. O'Briant that the paperwork from Arvest Bank had been mailed to her and that it was "normal" for her not to know how to make her payments until just before the first payment is due;

    e.   misrepresenting to Ms. O'Briant that Jim Glover had "just received" title to the Durango at the end of November when, in fact, title had been received in October;

    f.   misrepresenting to Ms. O'Briant that Jim Glover could not agree to certain reductions in costs related to her purchase of the Durango because the Dealership was required by law to charge the full amounts; and

    g.   dispatching two (2) agents to repossess the Durango when Ms. O'Briant had not breached the Finance Sale Agreement or any other agreement with Jim Glover.

110.    As a result of Jim Glover's breach of the Finance Sale Agreement, Ms. O'Briant has suffered actual damages in the form of financial losses and consequential damages.

**WHEREFORE**, Ms. O'Briant prays that the Court enter Judgment in her favor and against Jim Glover on her breach of contract claim, and award her the following relief:

    a.   Actual damages, including, but not limited to, her financial losses and consequential damages;

    b.   Pre-judgment and post-judgment interest, as permitted by law;

    c.   Attorney fees and costs; and

    d.   Such other and further relief as the Court deems just and proper.

## COUNT II – TORTIOUS BREACH OF THE
## IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

111.    Ms. O'Briant incorporates Paragraphs 10 through 110 above as if fully set forth in this Count II.

112.    A party to a contract may be liable in tort for breach of the implied duty of good faith and fair dealing if the party acted with "gross recklessness or wanton negligence." *See, e.g., Meyer v. Newrez LLC*, No. 24-CV-43, 2025 WL 242255, at *6 (N.D. Okla. Jan. 17, 2025) (also citing *Rodgers*).

113.    Jim Glover tortiously breached its implied duty of good faith and fair dealing by doing more than simply failing to honor its obligations under the Finance Sale Agreement.

114.    Among other things:

   a.    Jim Glover concealed its failure to secure financing for Ms. O'Briant's purchase through Arvest Bank and, instead, misrepresented that such financing had been secured on multiple occasions;

   b.    Jim Glover concealed that it had been unable to obtain the title to the Durango and, later, misrepresented that it did not receive title to the Vehicle until late November;

   c.    Jim Glover deceptively waited until December 2, 2025 to provide Ms. O'Briant with a copy of the Spot-Delivery Agreement (which she disputes signing) and then attempted to rely on the Spot-Delivery Agreement to justify its demand that Ms. O'Briant return the Durango or sign new purchase documents.

   d.    When Ms. O'Briant attempted to resolve her contractual dispute with Jim Glover through Lawrence, Lawrence misrepresented that she was legally prohibited from agreeing to discounts that Clinkenbeard later offered.

21

e. When Ms. O'Briant attempted to resolve her contractual dispute with Jim Glover by engaging the OUMV Commission, Knight misrepresented that Ms. O'Briant had "not completed the purchase agreement."

115. The above-described misconduct, at minimum, rises to the level of wanton negligence and reckless misconduct.

116. As a direct and proximate result of Jim Glover's tortious breach of its duty of good faith and fair dealing, Ms. O'Briant has suffered actual damages in the form of financial loss, emotional distress, and mental pain and anguish.

117. Jim Glover acted intentionally and with malice.

**WHEREFORE**, Ms. O'Briant prays that the Court enter Judgment in her favor and against Jim Glover on her tortious breach of the implied duty of good faith and fair dealing claim, and award her the following relief:

a. Actual damages, including, but not limited to, financial loss, emotional distress, and mental pain and anguish;

b. Punitive damages in an amount up to $500,000;

c. Pre-judgment and post-judgment interest, as permitted by law; and

d. Such other and further relief as the Court deems just and proper.

## COUNT III – VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT

118. Ms. O'Briant incorporates Paragraphs 10 through 117 above as if fully set forth in this Count III.

119. "The four elements of a consumer's private action under the [Oklahoma Consumer Protection Act] are: (1) that the defendant engaged in an unlawful practice as defined at 15 O.S. (1991), § 753; (2) that the challenged practice occurred in the course of defendant's business;

(3) that the plaintiff, as a consumer, suffered an injury in fact; and (4) that the challenged practice caused the plaintiff's injury." *Patterson v. Beall*, 2000 OK 92, ¶ 30, 19 P.3d 839, 846.

120.    Section 753(21) of the Oklahoma Consumer Protection Act ("OCPA"), 15 O.S. § 753, *et seq.*, makes it unlawful for a person to "[c]ommit[] an unfair or deceptive trade practice as defined in Section 752 of this title[.]"

121.    A "deceptive trade practice" is defined as "a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person."  15 O.S. § 752(13).  "Such a practice may occur before, during or after a consumer transaction is entered into and may be written or oral."  *Id*.

122.    An "unfair trade practice" is defined as "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  15 O.S. § 752(14).

123.    Jim Glover engaged in deceptive trade practices by engaging in the following misconduct:

a.    Jim Glover concealed its failure to secure financing for Ms. O'Briant's purchase through Arvest Bank and, instead, misrepresented that such financing had been secured on multiple occasions.

b.    Jim Glover concealed that it had been unable to obtain the title to the Durango and, later, misrepresented that it did not receive title to the Vehicle until late November.

c.    Jim Glover deceptively waited until December 2, 2025 to provide Ms. O'Briant with a copy of the Spot-Delivery Agreement (which she disputes signing) and

then attempted to rely on the Spot-Delivery Agreement to justify its demand that Ms. O'Briant return the Durango or sign new purchase documents.

    d.   When Ms. O'Briant attempted to resolve her contractual dispute with Jim Glover through Lawrence, Lawrence misrepresented that she was legally prohibited from agreeing to discounts that Clinkenbeard later offered.

    e.   When Ms. O'Briant attempted to resolve her contractual dispute with Jim Glover by engaging the OUMV Commission, Knight misrepresented that Ms. O'Briant had "not completed the purchase agreement."

124.    The above-described conduct was also immoral, unethical, oppressive, unscrupulous or substantially injurious to Ms. O'Briant.

125.    Jim Glover's dispatch of two (2) agents to repossess the Durango when Ms. O'Briant had not breached the Finance Sale Agreement or any other agreement with Jim Glover was an additional example of immoral, unethical, oppressive, unscrupulous and substantially injurious misconduct.

126.    Jim Glover's violations of § 753(21) were unconscionable.

**WHEREFORE**, Ms. O'Briant prays that the Court enter Judgment in her favor and against Jim Glover on her OCPA claim, and award her the following relief:

    a.   Actual damages;

    b.   Civil penalties in the amount of $2,000.00 per unconscionable violation of the OCPA;

    c.   Pre-judgment and post-judgment interest, as permitted by law;

    d.   Attorney fees and costs; and

    e.   Such other and further relief as the Court deems just and proper.

## <u>COUNT IV – VIOLATION OF THE TRUTH IN LENDING ACT AND REGULATION Z</u>

127.    Ms. O'Briant incorporates Paragraphs 10 through 126 above as if fully set forth in this Count IV.

128.    The goal of TILA is "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."  15 U.S.C. § 1601.

129.    The Consumer Finance Protection Bureau enforces TILA through Regulation Z.

130.    Regulation Z provides, in relevant part:

(a) Form of disclosures.

(1) The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep.

* * *

(b) Time of disclosures. The creditor shall make disclosures before consummation of the transaction.

12 CFR § 226.17(a).

131.    Courts have held that the words "in a form that the consumer may keep" require that a car dealership do more than simply go through the purchase documents and required disclosures as the buyer signs them.  *See, e.g., Gillom v. Ralph Thayer Auto. Livonia, Inc.*, 444 F. Supp. 2d 763, 768–69 (E.D. Mich. 2006).

132.    Instead, the dealership must provide the buyer with copies of the documents and disclosures at the time of the transaction.  *Id.*  Otherwise, the phrase "in a form that the consumer may keep" would be rendered meaningless.  *Id.* at 769.

133.    The Official Staff Interpretations of Regulation Z similarly provide, in part:

It is not sufficient for the creditor merely to show the consumer the document containing the disclosures before the consumer signs and becomes obligated. *The consumer must be free to take possession of and review the document in its entirety before signing*.

12 CFR Pt. 226, Supp. I, Subpt. C (Official Staff Interpretations), Section 226.17, 17(b) ¶ 3 (emphasis added).

134.    Thus, even where a dealership reviews purchase documents with the buyer, offering summaries of what each document provides and telling the buyer where to sign, the dealership has not complied with the requirements of 12 CFR 226.17(a) if copies of all signed documents are not provided to he buyer. *See, e.g., Price v. Berman's Auto., Inc.*, No. 14-763, 2014 WL 5686550, at *4 (D. Md. Nov. 4, 2014).

135.    Here, Jim Glover provided Ms. O'Briant with the documents in the Purchase Packet via email at the time she purchased the Durango.

136.    However, the Spot-Delivery Agreement was ***not*** included with the Purchase Packet as required by Regulation Z.

137.    Nevertheless, Jim Glover has attempted to rely on the Spot-Delivery Agreement to demand that Ms. O'Briant return the Vehicle.

138.    Again, Ms. O'Briant disputes signing the Spot-Delivery Agreement.

139.    Regardless, Jim Glover's failure to provide a copy of the Spot-Delivery Agreement to Ms. O'Briant "in a form she could keep" prior to (or at the time of) her "consummation of the transaction" violated Regulation Z.

**WHEREFORE**, Ms. O'Briant prays that the Court enter Judgment in his favor and against Jim Glover on her TILA claim, and award her the following relief:

a.    Actual damages;

b.  Twice the amount of the finance charge in connection with the transaction;

c.  Pre-judgment and post-judgment interest, as permitted by law;

d.  Attorney fees and costs; and

e.  Such other and further relief as the Court deems just and proper.

### COUNT V – FRAUD AND CONSTRUCTIVE FRAUD

140.  Ms. O'Briant incorporates Paragraphs 10 through 139 above as if fully set forth in this Count V.

141.  "[T]he elements of actionable fraud [are]: (1) a false material misrepresentation, (2) made as a positive assertion which is either known to be false or is made recklessly without knowledge of the truth, (3) with the intention that it be acted upon, and (4) which is relied on by the other party to his (or her) own detriment." *Bowman v. Presley*, 2009 OK 48, ¶ 13, 212 P.3d 1210, 1218.

142.  Constructive fraud may be established where a material fact has been concealed by one who has a legal or equitable duty to disclose that fact. *Hitch Enterprises, Inc. v. Cimarex Energy Co.*, 859 F. Supp. 2d 1249, 1262 (W.D. Okla. 2012).

143.  Constructive fraud may also become actionable "'where one undertakes to speak and conveys only partial information….'" *Id.* (citing *Roberts Ranch Co. v. Exxon Corp.*, 43 F. Supp. 2d 1252, 1259 n. 12 (W.D. Okla. 1997).  Stated another way, "[o]ne conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud ... since concealment is in effect a false representation that what is disclosed is the whole truth…." *Id.* (citing *Roberts Ranch*).

144.    Throughout its dealings with Ms. O'Briant, both before and after she signed the Finance Sale Agreement, Jim Glover misrepresented and concealed material facts, including the following:

  a.    Jim Glover misrepresented the damage to the Durango during its initial dealings with Ms. O'Briant when it was attempting to lure her into paying a deposit to reserve the Vehicle and then travel *two (2) hours* to sign purchase documents;

  b.    Jim Glover concealed its failure to secure financing for Ms. O'Briant's purchase through Arvest Bank and, instead, misrepresented that such financing had been secured on multiple occasions.

  c.    Jim Glover concealed that it had been unable to obtain the title to the Durango and, later, misrepresented that it did not receive title to the Vehicle until late November.

  d.    Jim Glover deceptively waited until December 2, 2025 to provide Ms. O'Briant with a copy of the Spot-Delivery Agreement (which she disputes signing) and then attempted to rely on the Spot-Delivery Agreement to justify its demand that Ms. O'Briant return the Durango or sign new purchase documents.

145.    Ms. O'Briant relied on Jim Glover's misrepresentations and concealments to her great detriment by, among other things, proceeding with her purchase of the Durango and holding off on exercising her right to rescind the deal.

146.    Ms. O'Briant suffered actual damages in the form of financial loss, emotional distress, and mental pain and anguish, as a direct and proximate result of Jim Glover's fraud and constructive fraud.

147.    Jim Glover acted intentionally and with malice.

**WHEREFORE**, Ms. O'Briant prays that the Court enter Judgment in her favor and against Jim Glover on her fraud and constructive fraud claims, and award her the following relief:

      e.     Actual damages, including, but not limited to, financial loss, emotional distress, and mental pain and anguish;

      f.     Punitive damages in an amount up to $500,000;

      g.     Pre-judgment and post-judgment interest, as permitted by law; and

      h.     Such other and further relief as the Court deems just and proper.

### COUNT VI – TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

148.    Ms. O'Briant incorporates Paragraphs 10 through 147 above as if fully set forth in this Count VI.

149.    Plaintiff respectfully requests that this Court enter a Temporary Restraining Order and, following an expedited hearing, a Preliminary Injunction enjoining and restraining Defendant from:

      a.   Repossessing, attempting to repossess, or threatening to repossess the Durango;

      b.    Contacting or attempting to contact Ms. O'Briant regarding repossession;

      c.   Taking any action to transfer title, sell, or otherwise dispose of the Durango;

      d.   Interfering with Ms. O'Briant's use, possession, or enjoyment of the Durango.

150.    "To succeed on a typical preliminary-injunction motion, the moving party needs to prove four things: (1) that she's 'substantially likely to succeed on the merits,' (2) that she'll 'suffer irreparable injury' if the court denies the injunction; (3) that her 'threatened injury' (without the injunction) outweighs the opposing party's under the injunction, and (4) that the injunction isn't adverse to the public interest.'" *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019).

151.    Ms. O'Briant satisfies all four (4) requirements for preliminary injunctive relief.

**A.     There is a substantial likelihood that Ms. O'Briant will succeed on the merits of her claims.**

152.    Ms. O'Briant's verified factual allegations in Counts I through V above, and the documentary evidence attached to this Verified Complaint, demonstrate that Ms. O'Briant has a substantial likelihood of success on the merits of this action.

**B.     Ms. O'Briant will suffer irreparable injury if her requested injunctive relief is not granted.**

153.    In the absence of injunctive relief, Ms. O'Briant will suffer irreparable injury that cannot be adequately compensated by a monetary damages award at the end of this lawsuit.

154.    Among other things, the loss of the Durango will leave Ms. O'Briant without a vehicle having the safety features of the Durango, which she purchased for the purpose of, among other things, transporting her daughter with her.

155.    The loss of the Durango also will substantially impede Ms. O'Briant's ability to perform her family and household responsibilities, particularly given that she and her family live in a rural community and often have to drive great distances for basic needs.

156.    Money damages at the end of a lawsuit would be an inadequate remedy for the injury Ms. O'Briant will suffer if injunctive relief is denied.

**C.     The irreparable injury to Ms. O'Brian greatly outweighs any perceived injury to Jim Glover if injunctive relief is granted.**

157.    Compared to Ms. O'Briant's certain irreparable injury (described in the preceding subsection), Jim Glover's potential injury from a temporary halt to repossession of the Durango is minimal.

158.    Jim Glover does not *need* possession of the Durango to conduct its business or perform any other function.

159.    Moreover, Ms. O'Briant has placed into trust the payments she would have made if Jim Glover were willing to accept them or if the Dealership had secured the financing from Arvest Bank, which it falsely claimed to have secured.

160.    Jim Glover is free to request that the funds being held in trust be disbursed to the Dealership at any time.

161.    Jim Glover is also free to accept future payments from Ms. O'Briant at any time.

162.    Jim Glover's nominal potential injury is greatly outweighed by the imminent and irreparable harm Ms. O'Briant faces if no injunction is granted.

**D.    Granting the requested injunctive relief is not adverse to the public interest.**

163.    Granting Ms. O'Briant's requested injunction is not adverse to the public interest.

164.    Indeed, it *serves* the public interest by protecting consumers from unlawful repossessions after being lied to and bullied by a car dealership.

165.    Ms. O'Briant will continue to place all payments due under the Finance Sale Agreement into her attorney's trust account or, at Jim Glover's option, release those funds to the Dealership and make future payments to it.

**E.    Ms. O'Briant requests an expedited hearing.**

166.    Ms. O'Briant intends to file a Motion for Preliminary Injunction soon after this case has been opened and respectfully requests, pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, that the Court hold an expedited hearing on the Motion at the earliest possible time.

167.    Ms. O'Briant will notify counsel for Jim Glover of this Verified Complaint and the Motion for Preliminary Injunction as soon as they are filed with the Court through its CM-ECF filing system.

**WHEREFORE**, Ms. O'Briant prays that the Court:

    a.    Enter a Temporary Restraining Order, without bond or upon such bond as the Court deems appropriate, enjoining and restraining Jim Glover from repossessing, attempting to repossess, or threatening to repossess the Durango pending a determination of the Motion for Preliminary Injunction; and

    b.    Enter a Preliminary Injunction and, thereafter, a Permanent Injunction, enjoining and restraining Jim Glover from (i) repossessing, attempting to repossess, or threatening to repossess the Durango, (ii) contacting or attempting to contact Ms. O'Briant regarding repossession, (iii) taking any action to transfer title, sell, or otherwise dispose of the Durango, and (iv) interfering in any way with Ms. O'Briant's use, possession, or enjoyment of the Durango.

## VI.
## JURY TRIAL DEMAND

168.    Ms. O'Briant demands a trial by jury.

Date: January 14, 2026

        Respectfully submitted,

        */s/ David M. Menditto*
        David M. Menditto, OBA 35485
        MENDITTO LAW PLLC
        15 West 6th Street, Suite 2505
        Tulsa, Oklahoma  74119
        (t) (918) 404-0670
        (e) david@mendittolaw.com

        *Counsel for Plaintiff, Morgan O'Briant*